# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

| | |
|---|---|
| **CHRISTINA D. MCKISSACK** | **CIV. ACTION NO. 5:21-01971** |
| **VERSUS** | **JUDGE S. MAURICE HICKS, JR.** |
| **KILOLO KIJAKAZI, ACTING COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

## Background & Procedural History

Christina McKissack filed the instant application for Title II disability insurance benefits on February 22, 2019. (Tr. 10, 161-167). McKissack, who was 50 years old at the time of the administrative hearing, asserted a disability onset date of May 6, 2018, because of diabetes insipidus, hypothyroid, migraines, and non-epileptic seizures. (Tr. 34, 193, 180). The state agency denied the claim initially on July 23, 2019, and upon reconsideration on December 16, 2019. (Tr. 54-92, 98-100). Thereafter, McKissack requested and received a March 5, 2020 hearing before an Administrative Law Judge ("ALJ"). (Tr. 29-53). In a December 22, 2020 written decision, the ALJ determined that McKissack was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an

adjustment to work that exists in significant numbers in the national economy.   (Tr. 7-23).

McKissack appealed the adverse decision to the Appeals Council.   On May 10, 2021, however,

the Appeals Council denied McKissack's request for review; thus, the ALJ's decision became

the final decision of the Commissioner.   (Tr. 1-3).

On July 9, 2021, McKissack filed the instant complaint for judicial review of the

Commissioner's final decision.   Following submission of the administrative transcript and

supporting memoranda, the matter is now before the court.

<u>**Standard of Review**</u>

This court's standard of review is (1) whether the final decision is supported by

substantial evidence, and (2) whether the Commissioner applied the proper legal standards to

evaluate the evidence.   *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).   The

Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative
> law to describe how courts are to review agency factfinding.   Under the substantial-
> evidence standard, a court looks to an existing administrative record and asks
> whether it contains "sufficien[t] evidence" to support the agency's factual
> determinations.   And whatever the meaning of "substantial" in other contexts, the
> threshold for such evidentiary sufficiency is not high. Substantial evidence, this
> Court has said, is "more than a mere scintilla.   It means—and means only—"such
> relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion."

*Biestek v. Berryhill*, ___ U.S. ___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted).

The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its

judgment for that of the Commissioner.   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.

1994).

Upon finding substantial evidence, the court may only review whether the Commissioner

has applied proper legal standards and conducted the proceedings consistently with the statute

and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A). A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual will be found not disabled if he or she does not have a

3

"severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.   If the individual can make such an adjustment, then he or she will be found not disabled.   If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps.   20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).   "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step."  *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

**I.     Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.   (Tr. 12)   At step two, she found that the claimant suffered severe impairments of craniopharyngioma status post

craniotomy; pseudoseizures; migraine headaches; borderline intellectual functioning; and anxiety. (Tr. 13). She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 13-15).

## II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels "but with the following nonexertional limitations: the claimant can work at unprotected heights; must avoid concentrated exposure to hazards including unprotected heights and dangerous machinery; and is able to perform simple, routine tasks." (Tr. 15-21).

## III.    Steps Four and Five

With the assistance of a vocational expert ("VE") the ALJ determined at step four of the sequential evaluation process that the claimant was unable to return to past relevant work. (Tr. 21). Accordingly, she proceeded to step five. At this step, the ALJ determined that the claimant was a "younger individual," with at least a high school education. (Tr. 22). She also found that transferability of skills was not material to the determination of disability. (Tr. 22-23).

The ALJ next observed that, given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. §§ 404.1569, 416.969; Rule 204.00, Appendix 2, Subpart P, Regulations No. 4; Tr. 22. However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a VE to determine whether, and to what extent, the additional limitations eroded the occupational base for work. (Tr. 22-23). In response, the VE

identified the representative jobs of **laundry laborer**, *Dictionary of Occupational Titles* ("DOT") Code # 361.687-018; **mailroom clerk**, DOT # 209.687-026; and **call out operator**, DOT # 237.367-014.   (Tr. 22, 51-53).[1]

### Non-Exhaustive Chronology of Relevant Medical Evidence

On October 5, 2016, McKissack saw Laura Kimball-Ravari, M.D., for an office visit. (Tr. 351-355).   She reported that her migraine headaches were much better and not nearly as bad as they had been previously.   *Id*.

McKissack went to the ELC Medicine Group on October 17, 2017.   (Tr. 291-292).   She had possible vertigo, and trouble getting words out.   *Id.*   She was having seizures, and the room was spinning.   *Id.*   The dizziness had started about one week earlier.   *Id.*   She had been having seizure activity that day.   *Id.*   She had not had seizures in seven to eight months.   *Id.*

McKissack saw Dr. Ravari on March 7, 2018.   (Tr. 347-350).   She was asymptomatic and did not want to undergo any more MRIs because of cost.   *Id.*

McKissack returned to ELC Medicine Group on April 25, 2018, with complaints of migraines for the past two months that were affecting her work.   (Tr. 289-290).   She could not focus on her computer and could not see the numbers.   *Id.*   She also was unable to perform physical work because of the seizure risk.   *Id.*   She was given seizure precautions and prescribed Ultram.   *Id.*

On May 9, 2018, McKissack went to ELC Medicine Group for follow-up.   (Tr. 287-

---

[1] The VE responded that for the laundry laborer, mailroom clerk, and call out operator jobs, there were 321,283, 72,520, and 45,216 positions available nationwide, respectively.   (Tr. 22, 51-53). This incidence of work constitutes a significant number (and range) of jobs in the "national economy."   42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

288).   Her migraines were not as constant, but she had started having seizures.   *Id.*   She reported four to five seizures per day within the past week, but they tended to happen when she was sleeping.   *Id.*   She was unable to work.   *Id.*   Paperwork was filled out for long-term disability.   *Id.*

On May 15, 2018, McKissack returned to ELC Medicine Group for seizures.   (Tr. 285-286).   She had a seizure while at the office.   *Id.*   She was actively seizing for more than 30 minutes.   *Id.*   EMS was called and they administered Versed which immediately stopped the seizure.   *Id.*   EMS took her to the emergency room.   *Id.*

On July 26, 2018, McKissack went to the Minden Medical Center with complaints of three "seizure-like" events since the day before.   (Tr. 419-424).   Her family stated that she could hear, but she could not answer.   *Id.*   She intermittently jerked her legs.   *Id.*   She was alert and oriented to person, place, and time.   *Id.*   She moved all extremities appropriately and obeyed commands.   *Id.*   Her mother stated that she did not think that McKissack had experienced a seizure in over one month.   (Tr. 421).   Her mother described the activity as random movement with confusion and "laughing" episodes.   *Id.*   McKissack only intermittently followed commands.   *Id.*   She did not have typical tonic/clonic rhythmic movements; rather, there were randomized movements of the upper/lower extremities along with episodes of laughing and dysarthric speech.   *Id.*   When asked questions, she responded with purposeful hand movements.   *Id.*   She was treated and discharged to home.   *Id.*[2]

On September 18, 2018, McKissack was admitted to the EMU for seizure characterization.   (Tr. 312-322).   She reported that, a few months previously, she had been on a

---

[2]  A July 26, 2018 CT scan of the brain was negative, with stable findings, including changes caused by right temporal craniotomy.   (Tr. 430-431).

cruise, with lots of lights, and had started having seizures.   *Id.*   The seizures had progressively worsened.   *Id.*   She did not have confusion following her seizures.   *Id.*   Five non-epileptic events were observed by Maria Riel-Romero, M.D.   (Tr. 320-330).   During photic stimulation, McKissack started blinking her eyes rapidly, frowning, then started coughing, with occasional asynchronous random jerking.   *Id.*   She could state her name after the event.   *Id.*   The seizure, however, was quite prolonged, lasting intermittently for fifteen minutes, where she had random jerking of her body and shaking of her face, and then jerking of her jaw intermittently.   *Id.* There was no EEG correlation for these events.   *Id.*   Dr. Thorat had witnessed an event and likewise was very suspicious for a nonepileptic event.   (Tr. 320).   McKissack was discharged with a diagnosis of psychogenic spells.   (Tr. 321).

McKissack returned to Dr. Ravari on October 3, 2018.   (Tr. 343-346).   She was status post-craniotomy in 2009.   *Id.*   Her last MRI was in 2014 and she declined any further MRIs. *Id.*   She had seizure-like activity and had done a study at LSU, which showed no seizures, and so she was taken off seizure medication.   *Id.*   McKissack explained that she had started having symptoms in March 2018 with "shaking spells," and eye sensitivity, similar to when she had been diagnosed with craniopharynigioma.   *Id.*   She then began having migraines for three months and has not been herself for six months.   *Id.*   Her migraine headaches were stable, with no change.   *Id*.   Ravari recommended a repeat MRI.   *Id.*   No cause was found for her persistent migraines.   *Id.*   She was encouraged to exercise.   *Id.*

McKissack saw Scott Phillips, M.D., as a new patient on November 12, 2018.   (Tr. 485-487).   She was screened for depression, but had none.   *Id.*   She was there for her seizures.   *Id.* He diagnosed unspecified convulsions, migraine, dizziness, and giddiness.   *Id.*

McKissack returned to Dr. Phillips on November 26, 2018, for seizures.   (Tr. 483-484).

8

He again diagnosed unspecified convulsions.  *Id.*

McKissack next saw Dr. Phillips on February 26, 2019.  (Tr. 480-482).  She reported that her seizures had started in 2008, but had been infrequent.  *Id.*  In May, however, the seizures had returned, and now she was having four per day.  *Id.*  She saw Dr. Thorat, who had diagnosed her with pseudoseizures.  *Id.*  The seizures caused her to stare off into space for several minutes, and then she had amnesia for the event.  *Id.*  A doctor at Baylor said that she could try cognitive behavioral therapy and take valproic acid.  *Id.*  However, her migraines worsened after she started taking the acid.  *Id.*  She reported sixteen episodes so far that month. *Id.*  She had left arm jerking type movements and sudden left gaze.  *Id.*  Phillips diagnosed, *inter alia*, unspecified convulsions, migraine, dizziness, and giddiness.  *Id.*  No driving or operation of machinery.  *Id.*

On April 3, 2019, McKissack saw Dr. Phillips for nausea, vomiting, and seizures.  (Tr. 549-551).  During spring break, she rode a horse and had been experiencing seizures since.  *Id.* She took Ativan the day before and it seemed to help a little bit.  *Id.*  She had started cognitive behavioral therapy about one month earlier.  *Id.*  She also had daily headaches that were worsening.  *Id.*  She reported light sensitivity that was horrible.  *Id.*

McKissack next saw Dr. Phillips on April 16, 2019 for her two-week follow-up.  (Tr. 547-548).  She reported that she was feeling much better since her last visit.  *Id.*  Her seizure intensity had decreased significantly.  *Id.*  However, her headaches and light sensitivity were still present.  *Id.*

McKissack returned to Dr. Phillips on May 9, 2019, for a four-week follow-up.  (Tr. 545-546).  Her mother reported that she had experienced multiple seizures since her last visit. *Id.*  Her headaches and light sensitivity were still present.  *Id.*  Her family thought that she

9

seemed much more depressed.  *Id.*  Phillips diagnosed, *inter alia*, major depressive disorder, recurrent, moderate.  *Id.*

McKissack went to the emergency room on May 9, 2019, for seizure activity that lasted approximately 25 minutes.  (Tr. 627-629).  She was administered Ativan which resulted in marked relief of symptoms.  *Id.*

On May 22, 2019, McKissack saw Stephanie Williams, NP for an office visit.  (Tr. 489-492).  She stated that her last MRI was in 2014.  *Id.*  She did not wish to follow up with neurosurgery because she was asymptomatic.  *Id.*  She continued to have migraines.  *Id.*  She requested an appointment with the Mayo Clinic because she was having daily episodes of epileptic activity.  *Id.*  She had multiple episodes per day, and it was very debilitating for her.  *Id.*  Her migraine headaches were stable, and she was unable to drive.  *Id.*  She was oriented to time, place, person, and situation.  *Id.*  She had appropriate mood and affect.  *Id.*  She stated that her medications were not helping with her non-epileptic seizures.  *Id.*

On May 31, 2019, Debbie Whatley, LPC-S, wrote a letter to the state agency wherein she stated that McKissack had participated in individual therapy from March 6 through April 17, 2019.  (Tr. 495).  McKissack had a diagnosis of adjustment disorder, with anxiety, and had demonstrated enormous progress throughout the counseling.  *Id.*

On June 5, 2019, non-examining agency physician, Hollis Rogers, M.D., reviewed the record and completed a physical residual functional capacity assessment form on which he indicated that McKissack had no exertional limitations, but needed to avoid concentrated exposure to hazards (machinery, heights, etc.) (Tr. 66-67).  He noted that the migraines would cause only mild, intermittent functional limitations.  *Id.*

McKissack saw William Tatum, D.O., at the Mayo Clinic on June 26, 2019.  (Tr. 522-

526).   She reported that the onset of her episodes occurred when she was 39 before she was diagnosed with craniopharyngioma.   *Id.*   The episodes occurred once or twice per day.   *Id.* The episodes waned to once every three to six months, even going as long as three years without one.   *Id.*   Over the past year and one-half, however, they had returned with greater frequency and intensity.   *Id.*   There were three different types:    staring spells, staring and twitching spells, and convulsions.   *Id.*   They occurred at any time, increased with physical activity, after eating, and with migraines as a trigger.   *Id.*   They consisted of arrhythmic, non-clonic, unilateral, asymmetric, out-of-phase jerks, involving her arms, and abduction/adduction movements of her legs with side-to-side head jerks and/or head tremor.   *Id.*   During an episode, she could hear, but not respond.   *Id.*   They lasted 20-30 minutes.   *Id.*   When delivered intravenously, Ativan led to immediate cessation.   *Id.*   The episodes now occurred three to four times per day.   *Id.*   Ten percent of the time they were independent stares and jerking.   *Id.* Major ones or convulsions happened about once per month and lasted from 10 to 30 minutes. *Id.*   She felt terrible, tired, and dazed after the episodes.   *Id.*   Tatum suspected ongoing, psychogenic nonepileptic attacks.   *Id.*   He also suspected generalized anxiety disorder.   *Id.*   He recommended no driving a car or operating a motor vehicle.   *Id.*   He further opined that McKissack should avoid climbing and heights.   *Id.*

McKissack saw Christopher Sletten, Ph.D., at the Mayo Clinic, Department of Pain Medicine, Pain Psychology, on June 27, 2019, to address "spells" and treatment recommendations.   (Tr. 502-503).   Her pain was impacting her ability to perform household chores, participate in hobbies/leisure, family functions, and errands.   *Id.*   Upon examination, she had good recent and remote memory, with no apparent abnormalities in attention or concentration.   *Id.*   She had good insight and motivation.   *Id.*   Sletten stated that she was an

excellent candidate for a three-week, pain rehabilitation program with physical and occupational therapy for physical reconditioning and improved activity tolerance.  *Id.*  In addition, Sletten intended to address the functional and behavioral morbidities that she was currently experiencing.  *Id.*

On June 27, 2019, McKissack was seen by Victor Bernet, M.D., at the Mayo Clinic. (Tr. 504-512).  McKissack was unclear as to why the consultation was requested.  *Id.*  Dr. Tatum's notes mentioned suspicion for a generalized anxiety disorder and the need to rule out an endocrinopathy.  *Id.*  McKissack had social get togethers twice per week and talked on the phone more than three times per week.  *Id.*  She was positive for excessive daytime sleepiness/tiredness.  *Id.*  However, she had normal mood and affect.  *Id.*  Her speech and behavior were normal.  *Id.*  Judgment and thought content were normal.  *Id.*  EEG showed no epilepticform activity.  *Id.*

At the request of the state agency, McKissack underwent a July 20, 2019 mental status examination with Susan Tucker, Ph.D.  (Tr. 536-542).  McKissack took Ativan for anti-convulsions and reported positive results.  *Id.*  She was able to manage most of her activities of daily living alone.  *Id.*  However, she had days where she had seizures throughout the day and required complete assistance.  *Id.*  She reported that her level of social interaction and social skills were poor.  *Id.*  Tucker administered the Wechsler Intelligence Scale for Adults-IV and McKissack obtained a full score of 70, which fell within the borderline range of intellectual functioning.  *Id.*

Tucker's diagnostic impressions included borderline intellectual functioning, uncontrolled seizures, hypothyroidism, post-brain surgery, migraines, diabetes, anxiety, and inhibited social life.  *Id.*  Tucker stated that McKissack's "reported limitations in sustaining

12

effort and persistence due to physical impairments are deferred to other specialties." *Id*. From a psychological perspective, Tucker opined that McKissack's mental impairments would not preclude her from focusing her attention or sustaining concentration, pace and persistence when performing simple and familiar tasks for extended periods. *Id*. She was considered capable of understanding, remembering, and following through with simple, repeated instructions. *Id.* She also would be able to maintain attention and perform simple academic tasks for a two-hour block. *Id*. Moreover, she would have no difficulty with peers or authority figures in a work setting. *Id*. Her coping resources did not preclude her from tolerating the stress, pressure, and social environment of a work setting. *Id.*

On July 23, 2019, non-examining agency psychologist, Cynthia Lindsey, Psy.D., completed a mental residual functional capacity assessment form on which she indicated that McKissack was moderately limited in her ability to understand and remember detailed instructions. (Tr. 67-68). She could carry out simple instructions, but was likely to require repetition and support with more detailed and complex instructions. *Id.* She also was moderately limited in her ability to maintain attention and concentration for extended periods. *Id.* However, she could sustain attention for up to two-hour blocks of time when performing simple and routine work-related tasks. *Id.*

On August 22, 2019, McKissack returned to Dr. Phillips for a clinching jaw. (Tr. 543-544). She was doing better with her seizures. *Id.* The Mayo Clinic had confirmed post-traumatic seizures, and her medication was helping. *Id.* She denied stressors. *Id.* Phillips diagnosed jaw pain, other seizures, GERD, and a BMI of 24. *Id.*

In an October 1, 2019 progress note, Rachel Perez, P.T., documented that McKissack felt much stronger. (Tr. 644-646). She had completed the pain rehabilitation center program and

13

was completely oriented to the exercises.   *Id.*[3]  McKissack had demonstrated a monumental increase in functional capacity over the course of the 3-week program.   *Id.*   She subjectively reported a change in her functional abilities from 28% to 86%.   *Id.*   Her goals were achieved, and she was discharged from the program.   *Id.*

An October 1, 2019 progress note from Tanya Crowder, O.T., indicated that McKissack planned to pursue entrepreneurial work in the areas of baking and cooking.   (Tr. 646-649).   Her goals had been achieved and she was discharged from the program.   *Id.*

On October 10, 2019, non-examining agency physician, Nancy Cook, M.D., reviewed the record and affirmed the earlier findings of Dr. Hollis.   (Tr. 84-85).

On October 11, 2019, non-examining agency psychologist, Margaret Hauck, Ph.D., reviewed the record and affirmed Dr. Lindsey's previous findings.   (Tr. 85-86).

In a November 11, 2019 to whom it may concern letter, Erica Torres, R.N., and Tanya Crowder, O.T., wrote that McKissack had participated in the three-week Mayo Comprehensive Pain Rehabilitation Center Program from September 10, 2019 through October 1, 2019.   (Tr. 751).   McKissack had demonstrated motivation and dedication to learning.   *Id.*   They were confident that continued attention to moderation of work and daily activities would allow McKissack to return to a 15-hour workweek by November 18, 2019.   *Id.*

McKissack saw Dr. Phillips on January 22, 2020, for her annual checkup.   (Tr. 563-566). She was doing better.   *Id.* The Mayo Clinic had confirmed post-traumatic seizures.   *Id.*   She

---

[3]  The pain rehabilitation center program ("PRC") is an intensive three-week outpatient program focused on providing multidisciplinary rehabilitative therapy to patients with chronic pain with the goal of improving quality of life and facilitating a return to daily activities via functional restoration.   (Tr. 735-736).

had learned how to better live with the problem.  *Id.*  Her migraines had improved.  *Id.*

On February 11, 2020, McKissack saw Dr. Ravari.  (Tr. 611-614, 817-820).  Her migraines were stable, with no change.  *Id.*  She had been diagnosed with conversion disorder, with seizures, per Mayo Clinic.  *Id.*  She still had periodic seizures but was not treated for them. *Id.*  She was very pleased with her treatment process and was feeling a lot better.  *Id.*  She had a very strict regimen, which required her to follow her diet, a sleep pattern, physical therapy exercises, and a daily schedule.  *Id.*  She had tried returning to work but was unable to handle it.  *Id*.

On June 26, 2020, Steven Goldstein, M.D. submitted responses to medical interrogatories.  (Tr. 801-810).  He indicated that none of McKissack's impairments met or equaled a listing.  *Id.*  In fact, he opined that she had no severe physical impairment at all.  *Id.* Consequently, she had no limitation of functioning.  *Id.*

On September 20, 2020, Dr. Phillips completed a medical source statement in which he wrote that McKissack could concentrate and focus on work tasks for less than one hour at a time. (Tr. 821-822).  She also needed more than the allotted rest periods in a typical workday, for 30 minutes at a time.  *Id.*  She frequently could lift five pounds, and occasionally lift and carry ten pounds.  *Id.*  She occasionally could engage in postural activities, with occasional exposure to machinery/vehicles.  *Id.*  However, she needed to avoid exposure to environmental factors.  *Id.* She had symptoms of pain, spasms, weakness, and fatigue from her seizure disorder, which were of marked severity and frequently would cause her to work at a slower pace or to be distracted from work.  *Id.*  She also would miss one to two days of work per month.  *Id.*  His diagnoses included unspecified convulsions, migraines, dizziness, and giddiness.  *Id.*

15

## Analysis

In her decision, the ALJ reviewed the available evidence, including the hearing testimony, the claimant's activities of daily living, treatment records, and the impressions of the consultative, treating, and non-examining physicians, psychologists, medical consultants, and other medical professionals.   (Tr. 18-20).   In deriving McKissack's RFC, the ALJ generally found persuasive the opinions of the state agency medical consultants and the consultative psychologist, but, overall, found unpersuasive the opinions of McKissack's treating medical providers.   (Tr. 15-21).

The court emphasizes that for claims filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating physicians and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources.   20 C.F.R. §§ 404.1520c(a) and 416.920c(a).   Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion. *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c).   Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency.   20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

"Supportability" focuses upon how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s) . . ." 20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1).   "Consistency" refers to how "consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim . . ."   20 C.F.R. §§ 404.1520c(c)(2) and 416.920c(c)(2).

16

Only when two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same," will the Commissioner then articulate how she considered the "other most persuasive factors," such as the medical source's relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship); the medical source's specialization; and other factors (including a medical source's familiarity with other evidence of the claim or an understanding of the agency's disability program's policies and evidentiary requirements). 20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c). Otherwise, the Commissioner, may, but is not required to explain these additional factors. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

In her memoranda, McKissack noted some discrepancies in the ALJ's decision, but principally contends that the ALJ erred in her weighing of the medical opinions. The court will address her arguments, in turn.

## I.    The ALJ Improperly Rejected Limitations Imposed by Drs. Phillips and Tatum.

McKissack contends that the ALJ erred when she rejected opinions by her primary care physician, Dr. Phillips, and her treating/consultative physician, Dr. Tatum, that she must avoid hazards and refrain from driving. *See* Pl. Brief, pg. 6 [doc. # 7] (citing Tr. 481, 483, 485, 492, & 524). She emphasized that a treating source has the advantage of a longitudinal experience with the claimant. McKissack further asserted that the ALJ's RFC is "hopelessly confused" because it provided that "the claimant can work at unprotected heights," but, in the next breath stated that she "must avoid concentrated exposure to hazards including unprotected heights and dangerous machinery . . ." *See* Tr. 15-21.

In her response brief, however, the Commissioner appropriately attributed the

17

inconsistency in the ALJ's RFC to a scrivener's error.    (Comm'r Brief, pg. 6 [doc. # 10]).    As the Commissioner noted, the ALJ posed a hypothetical to the VE at the hearing that included the need to "avoid concentrated exposure to hazards, including unprotected heights and dangerous machinery."    (Tr. 51).    In any event, for the representative jobs identified by the VE, the *Dictionary of Occupational Titles* confirms that there is no climbing involved and no exposure to moving mechanical parts.    *See* DOT # 361.687-018, 1991 WL 672992; DOT # 209.687-026, 1991 WL 671813; and DOT # 237.367-014, 1991 WL 672186.[4]    In short, any error was harmless.    *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988) (procedural perfection in the administrative process is not required).

## II.    The ALJ Improperly Relied on Dr. Tucker's Opinion to Comment upon Pseudoseizures and Migraine Headaches

McKissack contends that the ALJ impermissibly relied upon the opinion of the consultative psychologist, Dr. Tucker, to assess the effects of her physical impairments, i.e., her pseudoseizures and migraine headaches.    However, the argument's premise is not supported by a reading of the ALJ's decision.    To the contrary, it is manifest that the ALJ relied upon Dr. Tucker's findings to assess the effect of McKissack's mental impairment(s).    *See* Tr. 14-15, 19.[5]

McKissack further argues that the ALJ compounded her error when she found Dr. Tucker's opinion persuasive on the purported basis that it was supported by "routine psychiatric

---

[4]  Moreover, at the hearing, McKissack conceded that she drove a few times per week.    (Tr. 35).

[5]  Even if she *had* relied on Dr. Tucker's findings for purposes of assessing psychogenic nonepileptic seizures, f/k/a pseudoseizures, these episodes often have a psychiatric origin.    *See e.g.*, https://www.ncbi.nlm.nih.gov/books/NBK441871/ (last visited on Aug. 16, 2022).    In fact, Dr. Tatum suspected ongoing, psychogenic nonepileptic attacks and a generalized anxiety disorder.    (Tr. 522-526).    Moreover, McKissack told Dr. Rivari that she had been diagnosed with a conversion disorder.    (Tr. 611-614, 817-820).

examinations that highlight she [was/is] psychiatrically stable . . ."   (Tr. 19).   McKissack maintains that the ALJ did not cite the aforementioned "psychiatric examinations."   But she did. The ALJ cited the psychiatric findings of McKissack's office visits with her treating physicians, Drs. Ravari and Phillips.   *See* Tr. 19, 345, 249, 485, & 491.   While these psychiatric findings clearly were not the focus of the office visits, they nonetheless show, *inter alia*, that McKissack was alert, oriented x3, with a normal affect, and no thought disorder, which is consistent with Dr. Tucker's evaluation.   *Id*.

In lieu of the benign psychiatric findings by non-specialist physicians, McKissack argues that the ALJ should have credited the findings of her treating mental health professional, Debbie Whatley.   (Tr. 495).   However, the ALJ expressly declined to do so on the grounds that Ms. Whatley failed to reference her treatment notes to support her reduced level of functioning, and, thus, appeared to rely on the claimant's subjective complaints.   (Tr. 19).

Of course, the supportability of a medical source's opinion depends upon the objective medical evidence and the supporting explanations provided by that source.   20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1).   Moreover, following the amendments to the regulations that became effective in March 2017, the Commissioner will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources.   20 C.F.R. §§ 404.1520c(a) and 416.920c(a).   Accordingly, the ALJ's stated reason for discounting Ms. Whatley's opinion is consistent with the new regulations, supported by the record, and falls well within her discretion.

### III.    The ALJ Erred by Faulting Ms. Crowder and Ms. Torres for Failing to Cite to Treatment Records to Support their Opinion

In her decision, the ALJ recited the succinct November 11, 2019 letter from Ms. Crowder and Ms. Torres wherein they documented McKissack's participation in the three-week Mayo

Pain Rehabilitation Program and their associated impression that, with continued attention to moderation of work and daily activities, McKissack should be able to return to a 15-hour workweek by November 18, 2019.   (Tr. 751).   However, the ALJ deemed the opinion "not persuasive," because there was no evidence from a physical and/or psychiatric perspective that McKissack would not be able to engage in full-time work subject to the limitations included in the RFC.   (Tr. 19-20).   The ALJ further noted that Torres and Crowder failed to cite any treatment records to support their reduced workweek opinion.   *Id*.   In fact, the treatment records reflected that McKissack responded well to treatment and gained better ability to manage her seizures and migraine headaches.   *Id*.

McKissack faults the ALJ for her failure to apply all of the §§ 404.1520c(c) factors. However, the ALJ is not required to proceed past the supportability and consistency factors unless two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same."   20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c).   Here, the ALJ found that Crowder and Torres's opinion was not well supported or consistent with other medical sources.

McKissack argues that the ALJ applied an improper legal standard when she discounted Torres and Crowder's workweek limitation on the basis that they failed to cite support from the treatment records.   Again, however, the regulations provide that supportability of a medical source's opinion depends upon the objective medical evidence and the supporting explanations provided by that source.   20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1).   Torres and Crowder provided no support for their assessed workweek limitation.   Moreover, McKissack was able to muster no more than two instances in the entire 2-3 week program where the

practitioners observed her having a spell.   (Pl. Brief, pg. 11).   In addition, one of the physical therapists noted that upon discharge from the program, McKissack had experienced a "monumental increase in functional capacity," and subjectively reported an increase in her functional abilities from 28% to 86%.   (Tr. 645-646).   McKissack's self-reported strength and her ability to sit, twist, walk, and engage in recreational activities had increased to 8 or 9 on a 10-point scale.   *Id*.

Finally, McKissack complains that the ALJ applied a double standard because she did not impose a citation-to-supporting-evidence requirement upon the medical sources that she found persuasive.   However, those sources did cite to the medical record.   *See, e.g*., Tr. 64-68, 84-86, 536-542.   Furthermore, Dr. Goldstein reviewed all of the records supplied to him by the SSA. (Tr. 807).

**IV.   The ALJ Improperly Rejected Limitations Imposed by "Dr. Goldstein"**

McKissack contends that the ALJ erred by rejecting "Dr. Goldstein's" opinion that her symptoms would require her to miss one to two days of work per month.   (Tr. 20).   However, as McKissack later conceded, it was Dr. Phillips who issued this limitation, not Dr. Goldstein. *See* Tr. 822.   Moreover, considering that in the preceding paragraph the ALJ addressed other limitations endorsed by Dr. Phillips in his medical source statement, it is readily apparent that the ALJ inadvertently referred to Dr. Phillips as Dr. Goldstein in the paragraph at issue.   Any error in the mistaken reference is harmless.

Further, the ALJ proceeded to discount the physician's projection that McKissack would miss one to two days of work per month on the basis that the limitation was speculative and unsupported by any objective evidence in the record.   (Tr. 20).   In other words, the limitation

was inconsistent and, therefore, not persuasive.   *Id*.   McKissack takes issue with this purported rationale because "speculative" is not an authorized ground to reject an opinion, and, regardless, there are plenty of instances in the record to support her seizures.

However, "speculative," at least in the present context, merely represents another way of saying unsupported, which is a valid consideration under the regulations.   *See* discussion, *supra*. Moreover, in the absence of any rationale proffered by Dr. Phillips for the limitation, it likely stems from McKissack's subjective complaints, rather than objective evidence, as the ALJ noted. Indeed, the form is entitled MEDICAL SOURCE STATEMENT ABOUT WHAT YOUR PATIENT CAN DO DESPITE IMPAIRMENT(S) and specifically included Ms. McKissack's name, in type, interspersed throughout the document.   *See* Tr. 821-822.   Consequently, it cannot be ruled out that completion of the form was patient-driven and influenced by a desire to please or assist the patient.

## Conclusion

The ALJ in this case was tasked with determining whether the claimant was disabled.   In so doing, she considered the hearing testimony, the medical records, and expert opinion evidence.   The evidence was by no means uniform, and according to McKissack, should have compelled a different result.   However, conflicts in the evidence are for the Commissioner to resolve.  *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).   Ultimately, the ALJ credited the opinions of the consultative psychologist, the agency physicians, the agency psychologists, and the medical expert in lieu of the opinions of McKissack's treating providers.   Following implementation of the updated regulations, the ALJ has increased leeway in this regard.

**In the end, this court is not at liberty to "reweigh the evidence in the record, try the**

22

issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra* (emphasis added). Rather, the limited dual inquiry presented is whether the Commissioner's determination that plaintiff was not disabled under the Social Security Act is supported by substantial evidence and free of legal error. Upon review of the arguments, the court is satisfied that the Commissioner's decision comports with the foregoing standard.[6] Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

---

[6] That is not to say that the Commissioner's decision is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision. *Mays, supra.* Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

In Chambers, at Monroe, Louisiana, on this 18th day of August, 2022.

_____

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE